David W. Lunn, #019526
DKL Law, PLLC
14555 North Scottsdale Road, Suite 240
Scottsdale, Arizona 85254
Telephone: (480) 500-1360
Facsimile: (480) 500-7341
david@dkllawfirm.com
          -and-
Marie Napoli (*pro hac vice pending*)
Napoli Law, PLLC
1301 Avenue of the Americas, 10th Floor
New York, New York 10019
Telephone: (212) 397-1000
MNapoli@napolilaw.com
          -and-
Brittany Weiner (*pro hac vice pending*)
Imbesi Law, P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone: (212) 736-0007
brittany@lawicm.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| JAY BONKE, individually, and on behalf of all others similarly-situated,<br><br>Plaintiffs,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.; RAISER, LLC; JOHN DOES I-V and JANE DOES I-V; BLACK CORPORATIONS I-V; WHITE LIMITED LIABLITY COMPANIES I-V; and GREEN PARTNERSHIPS I-V,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Jay Bonke ("Plaintiff" or "Mr. Bonke"), by and through his undersigned counsel, alleges on behalf of himself and of those similarly situated as follows:

/ / /

1

**INTRODUCTION**

1.       Plaintiff brings this action by and on behalf of current and former Arizona Uber Drivers, including Plaintiff ("Uber Drivers" or "Drivers"), against Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited Liability Company and wholly owned subsidiary of Uber ("Defendants" or "Uber"), for damages and equitable relief arising from Defendants' misclassification of Uber Drivers as independent contractors.

2.       Uber Drivers lack discretion in the performance of their employment relationship with Uber.  Uber Drivers have no independence apart from Uber in performing their job.  Uber can and has terminated Uber Drivers at-will.

3.       Uber Drivers are able to secure fares only through Uber's mobile application, which controls every aspect of Uber Drivers' transportation services for Uber.  When Uber restricts a Driver's access to Uber's mobile application, the Driver is unable to work for Uber or Uber's users. Uber's misclassification of its Drivers as non-employees of the company has resulted in their inability to earn minimum wage.

4.       Plaintiff alleges that he and other Uber Drivers are employees, and as employees, are entitled to basic wage protections such as expense reimbursement, overtime pay, rest- and meal-breaks, and other benefits that attach to employees that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors in order to evade these and other protections of applicable federal and state law.

5.       Uber has and continues to misrepresent to the public and to the Drivers the manner by which it compensates its Drivers regarding customary gratuities.  As a result, Uber has been able to retain a percentage of the fare generated by the Drivers that is grossly disproportionate to the Drivers' monetary retention from the fare.

6.       At various times during the Class Period (defined *infra*) Uber has marketed and gained significant revenues by express and by implicit advertising that its rides are gratuity-included.  To date in Arizona, examples include: (i) there is "[n]o need to tip[,]"[1] (ii) "No cash, no

---

[1]  https://www.uber.com/cities/phoenix/ (last accessed on May 11, 2016).

tip, no hassle[:] When you arrive at your destination, just hop out- we'll automatically charge the credit card on file.  And there's no need to tip."[2]   However, at no time during the Class Period did Uber remit the gratuity (or an in-kind amount) to Uber Drivers.  Uber effectively takes the Drivers' tips.

7.     Further, Plaintiff and members of the putative class finance all expenses related to their employment with Uber (*e.g.,* gas, cost of insurance, deductibles, and vehicle maintenance, among others).

8.     Most Uber Drivers have and continue to earn less than Arizona's minimum wage, which was $7.90 in 2014, $8.05 in 2016, and $8.05 in 2016, as a direct and proximate result of Uber's misclassification of its Drivers.

9.     Plaintiff and the class he seeks to represent are legally entitled to fundamental wage protections that federal law and Arizona wage and hour laws afford other Arizona employees. Plaintiff seeks damages and other appropriate relief on behalf of himself and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendants.

## PARTIES

10.     Plaintiff Jay Bonke is a citizen of Arizona and a resident of Maricopa County. Plaintiff currently works for Uber as an Uber driver.

11.     Defendant Uber Technologies, Inc. is a Delaware corporation headquartered at 1455 Market Street, San Francisco, California, 94103.  Defendant Uber owns and operates the Uber transportation service and is authorized to conduct business and does conduct business throughout the State of Arizona.

12.     Defendant Rasier, LLC, a subsidiary of Uber and the equivalent of Uber for the purposes of this action, is a Delaware limited liability company headquartered at 1455 Market Street, San Francisco, California, 94103.  Defendant Rasier is a wholly owned subsidiary of Uber, and is authorized to conduct business and does conduct business throughout the State of Arizona.

---

[2] https://www.uber.com/ride/ (last accessed on May 11, 2016).

13.     Each of the Defendant JOHN DOES 1 - 10 is the agent, servant, partner, joint-venturer, coventurer, principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its codefendant(s) in said co-defendant(s) performance of the acts and omissions described below.   Plaintiff names each of these Doe Defendants by fictitious names because Plaintiff does not know these Defendants' actual identities and capacities.   Despite reasonable efforts, Plaintiff has not been able to ascertain the identity of John Does 1-10.

## **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Fair Labor Standards Act (29 U.S.C. § 201 *et seq*.).

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are minimally diverse in that Plaintiff is a citizen of the State of Arizona and Defendants are citizens of the State of Delaware.

16.     This Court has matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) the aggregate value of the amount in controversy exceeds the sum or value of $5,000,000.00, (ii) there is minimal diversity of citizenship between Plaintiff and Defendants, and (iii) the Class consists of more than 100 members.

17.     This Court has jurisdiction over Defendants because Defendants intentionally avail themselves of the rights and privileges of conducting business in the State of Arizona, have continuous and systematic contacts with the State of Arizona, and the injuries giving rise to the claims herein occurred in the State of Arizona.

18.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims herein are so closely related to the claims over which the Court has original subject matter jurisdiction that the state law claims form part of the same case or controversy.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District, and because Defendants: (i) are authorized

to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of their service in this District, (ii) do considerable business in this District, and (iii) are subject to personal jurisdiction in this District.

20.    Plaintiff alleges on information and belief that each Defendant acted in all manner relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## **FACTUAL ALLEGATIONS**

21.    Mr. Bonke began working for Uber as an "UberX" driver in October 2014.  Mr. Bonke continues to work for Uber as an Uber Driver.

22.    On average, Mr. Bonke has driven between forty (40) and fifty (50) hours per week throughout his employment with Uber, and Uber compensates Mr. Bonke on a weekly basis.

23.    Uber compensates its Drivers weekly.  Uber takes 20% of the total fares and the Driver receives the remaining 80%.  Because Plaintiff was improperly classified as an independent contractor, he had to pay all employment related expenses, including gas, car repairs, lease payments, and insurance from his portion of the fare.

24.    On average, Mr. Bonke earned approximately $500 to $750 each week, and incurred approximately $275 each week in expenses, including but not limited to gas, insurance, and car repairs, resulting in an effective hourly wage of $7.70, which reflects Mr. Bonke's total hourly compensation as an Uber Driver.  Arizona's minimum wage in 2014 was $7.90.  Thereafter, Arizona's minimum wage increased, enlarging the disparity between Plaintiff's earnings and the minimum wage to which Plaintiff was and is entitled.

25.    For example, during the week of April 11, 2016 to April 18, 2016, Mr. Bonke earned $437.11 when he was online for 32 hours and 28 minutes. After paying approximately $250 in gas, lease payments, car repairs, and phone expenses, Mr. Bonke earned $187.11. This resulted in an effective hourly wage of $5.79, well below Arizona's minimum wage.

26.     Mr. Bonke's effective hourly wage was not at any time offset by expense reimbursement.   Although it is currently unknown to Plaintiff as it pertains to Arizona, Uber has saved as much as $730,000,000 since 2009 by not reimbursing the on-the-job expenses in California and Massachusetts.[3]

27.     On December 11, 2015, Defendants issued its most recent and operative contract with its Uber Drivers, self-servingly styled as a "Technology Services Agreement" (the "Agreement").  The Agreement contains a class action waiver arbitration provision.  Among other things, the Agreement requires Drivers to opt out of the mandatory arbitration provision within 30 days.  On December 11, 2015, Mr. Bonke timely opted out of the arbitration provision by sending an e-mail to optout@uber.com and stating: "Jay Bonke I do not wish to participate in the arbitration provision."

28.     The Agreement supersedes prior contracts and is the governing document as between Drivers and Ubers currently.  Paragraph 14.5 of the Agreement provides: "This Agreement … replaces and supersedes all prior or contemporaneous agreements[.]"

29.     Because the Agreement included a change from earlier agreements regarding California's Private Attorney General Act, Mr. Bonke received a renewed opportunity to opt out of arbitration and pursue his claims in federal court, which he has done.

30.     Defendants employed Plaintiff and members of the Class, and exercised control over their wages, their hours, and their working conditions.

31.     Defendants regulate every aspect of Uber Drivers' job performance and terminate them at-will.

32.     Uber requires Plaintiff and Uber Drivers to register their cars with Uber and the vehicles cannot be more than ten years old.

33.     Uber Drivers do not pay Defendants to use Defendants' intellectual property, the mobile application.  Uber Drivers do not, in the strictest sense, pay Uber a fee as consideration for use of Uber's mobile application.  Rather, Defendants compensate their Uber Drivers based upon

---

[3]     http://qz.com/680503/uber-saved-730-million-by-hiring-drivers-in-two-states-as-contractors-instead-of-employees/ (last accessed on May 11, 2016)

the employment arrangement that Uber unilaterally imposed upon its Drivers, as with any employment-based business model.

34.     Uber Drivers are not engaged in a business distinct from Uber's business.  Uber's application ensures this.  Through the application, Uber controls and directly manages Uber's entire transportation service, critically inclusive of its Drivers.

35.     Plaintiff's and Uber Driver's ability to earn income depends solely on Uber and not in any way on an Uber Driver's particular skill or acumen, or on any managerial or other discretionary job skill.

36.     Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application – an expense that Uber, the employer, should pay.

37.     Uber misled Plaintiff  and other Drivers as to the amount of income he could earn driving for Uber.  Uber told Plaintiff that drivers can earn $2,000 a week by driving for Uber. Plaintiff did not earn the guaranteed hourly pay that Uber promised, regardless of the fact that the Plaintiff worked more than a 40-hour week.



38.     Even if a Driver could earn $2,000 a week, the advertisement and offer is deceptive and misleading because in reality, as evident from Plaintiff's the absent class members' experience, after accounting for expenses and other costs improperly borne by Plaintiff and the absent class members, Uber's Drivers often make less than minimum wage:  $7.90 an hour in 2014, and $8.05 an hour in 2015.

39.     Moreover, Plaintiff and Uber Drivers do not receive (in-kind or otherwise) gratuity.

40.     Uber markets its rides in a manner that causes a reasonable and justified belief in its Drivers and its riders that its Drivers are gratuity-compensated, and that as such, there's no need to tip.

41.     In Arizona, Uber specifically advertises: (i) there is "[n]o need to tip[,]"[4] (ii) "No cash, no tip, no hassle[:] When you arrive at your destination, just hop out- we'll automatically charge the credit card on file.  And there's no need to tip."[5]

42.     The following national advertisement misleadingly confers that gratuity is included in the total cost of the fare and that there is no need to tip the Uber Driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file = there's no need to tip.

43.     In the following advertisement, Uber makes it more than clear that tips are included in the total cost of the fare for an Uber ride, *unless* the ride is through a conventional taxi, in which case the tip is not included or built-in to the total cost of the fare.

/ / /

/ / /

/ / /

---

[4] https://www.uber.com/cities/phoenix/ (last accessed on May 11, 2016).

[5] https://www.uber.com/ride/ (last accessed on May 11, 2016).

# CHANGE UBERTAXI TIP AMOUNT

You can change your default gratuity percentage for uberTAXI trips by signing in at the link below. This setting will only apply in cities where uberTAXI is offered and does not affect fares on other products such as uberX or UberBLACK.

To change your default uberTAXI gratuity amount:
- Navigate to "Payment"
- Select your preferred gratuity percentage from the dropdown menu

Please note: the gratuity you select will apply to all future taxi trips that you request and pay for through Uber. It will not affect uberT trips, where in-app payment is not supported.

Remember, there is no need to tip on other Uber services.

riders.uber.com

44.     Because the gratuity is reasonably expected to be in the total cost of the fare, Uber instructs its Drivers to decline acceptance of gratuity from Uber riders (as that would undermine Uber's entire "hassle free" campaign regarding tipping).

45.     Due to Uber's "there's no need to tip" mandate, Plaintiff and Uber Drivers have sustained damages in the amount of gratuity that they would have received (even if in-kind) but for Uber's misrepresentation.

46.     In addition to its deceptive and unlawful practice regarding tipping, Uber misclassifies its Drivers, including Plaintiff and absent class members, as independent contractors when they should be treated as employees.

47.     Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards, or for any other reason), and fare setting.   The Drivers do none of these things, which one would expect if they were truly independent from Uber.

48.    Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

49.    Uber controls all work aspects of its Uber Drivers including Plaintiff, concerning the manner, methods, and means of their provision of transportation services for Uber.  For example, Plaintiff was instructed on the Uber requirements for picking up customers.  Uber retains all necessary control over Plaintiff's and Uber Drivers' performance.

50.    Uber monitors Plaintiff and Uber Drivers to ensure compliance with Uber's control standards.  Uber requires all Drivers, including Plaintiff, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars.  Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week.  If an Uber Driver fails to maintain an average customer rating of 4.5, Uber gives the Driver 30 days to raise her rating within the required threshold.   If the Uber Driver does not do so, Uber terminates that Driver's employment with Uber by deactivating the Driver's ability to use the application to pick up customers, and thus continue to work.  Uber also terminates its Drivers if they do not log a certain number of hours driving, as required by Defendants, even though Uber markets its service to Drivers in a manner that causes them to believe that they are in total control of their work performance.

51.    Moreover, Uber sets the fares with no negotiation or input from Plaintiff and the absent class members.  Drivers are required to charge the cost determined solely by Uber.  Uber bills riders for the entire amount before remitting payment to Uber Drivers.  Uber Drivers are paid by Uber.

52.    Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers.  For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

53.    Uber is Plaintiff's and the absent class members' employer and owes them a recognition of their employment status.

54.     As a result of the intentional misclassification of its employees, Uber has not provided Plaintiff and other similarly aggrieved Driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).  Also resulting from this misclassification is Uber's failure to keep accurate payroll records evidencing Plaintiff's and other Drivers' hours worked and wages paid and gratuities retained.  Uber likewise does not pay into any insurance fund, including Social Security, disability, or unemployment insurance.

## **CLASS ALLEGATIONS**

55.     Plaintiff commences this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class of persons, of which Plaintiff is a member:

> All natural persons who have driven for and/or who continue to work for Uber as an Uber Driver within the State of Arizona from 2010 and continuing.

56.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

57.     This proposed class satisfies the numerosity requirement.  Members of the proposed Class are so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.  The precise number of Class members is unknown as the data required to calculate that number is presently within the sole possession, custody, or control of Defendants.  Upon information and belief, there are thousands of Uber Drivers in the State of Arizona, and thus in the proposed Class.

58.     This proposed class satisfies the commonality requirement.  There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including but not limited to:

a.      The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

b.      Whether Defendants are and were subject to overtime wage requirements;

c.      Whether Defendants' policy and practice of classifying Class members as exempt from overtime wages under federal law and Defendants' policy and practice of failing to pay overtime wages violates applicable provisions of federal law;

d.      Whether Defendants violated Arizona law by their policies, practices, and procedures concerning or relating to rest periods for the Class members;

e.      Whether a gratuity is included in the total fare for Class members' services;

f.      Whether Defendants were and are required to distribute the total proceeds of those gratuities to the Class members;

g.      Whether Class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

h.      Whether Defendants improperly classified Class members as independent contractors rather than employees;

i.      Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

j.      Whether Defendants have violated Arizona minimum wage law;

k.      The proper measure of damages and the proper measure of restitution recoverable by Class members; and

l.      Additional common questions of law and fact as developed during the discovery phase of this litigation.;

12

59.     This proposed class satisfies the typicality requirement.  Plaintiff's claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiff seeks is typical of the relief that Class members seek.  All of the Class members were subject to the same pattern and practice of Defendants as alleged herein.  Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of the Defendants.

60.     Plaintiff is an adequate class representative.  Plaintiff is able to fairly and adequately protect the interests of the Class and have no interests adverse to the Class.  At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

61.     Class treatment of this action is superior to any other manner of adjudication.  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.  The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

62.     The Class members are also readily ascertainable.  For purposes of notice and other purposes related to this action, their names and addresses are known to Defendants.  The number and identity of the Class members are determinable from the records of Defendants.

63.     The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the

resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## COUNT I

### (Violations of Arizona Law)

64.     Plaintiff, on behalf of himself and the proposed class, repeats and reallege all preceding paragraphs as if fully set forth herein.

65.     Uber's treatment of Plaintiff and control exercised by Uber indicate that Plaintiff is an employee and not an independent person contracting with Uber.

66.     Plaintiff alleges that on a busy workday, Uber Drivers receive approximately fifteen (15) ride requests through the Uber mobile application.  Once the request is received, Plaintiff has an option to either "accept" or "reject" the request.  Uber requires as a condition of employment with Uber that the Drivers accept approximately ninety percent of the requests.  Accepting less than this threshold results in Uber deactivating the Drivers' account, and therefore, preventing the driver from receiving any rider requests.

UBER - Deactivation: Your account has been temporarily deactivated for 24 hours because you were accepting less than 90% of the requests you receive. It will be automatically reactivated in 24 hours.
4:41 PM

Add text

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

### ERROR

You rejected too many riders. Please wait up to 60 minutes to go back online.

OK

## HOW ARE ACCEPTANCE RATES CALCULATED?

Acceptance rates are calculated as a percentage of the total number of requests you accept out of those sent to you while online.

Maintaining a high acceptance rate keeps the Uber system reliable for riders and drivers. You should accept at least 80% of trip requests to retain your account status.

Please note that a rider canceling a trip will never count against your acceptance rate.

16      67.     Rejecting a certain number of requests will negatively impact Plaintiff's customer

17  rating.  The employment agreement terms between Uber Drivers and Defendants, updated last on

18  December 11, 2015, contains a provision that specifically states that the Uber Drivers' "failure to

19  accept User requests for Transportation Services while [they] are logged in to the Driver App

20  creates a negative experience for Users of Uber's mobile application."  If the customer rating falls

21  below a 4.5, the driver faces termination from employment with Defendants, or a temporary

22  deactivation of access to the Uber mobile application, *i.e.*, probation.

23

24

25

26  / / /

27  / / /

28  / / /

68.     Plaintiff seeks damages pursuant to Arizona Revised Statutes ("A.R.S." for Uber's violations of the same, including:

a.      wrongful retention of portions of gratuities intended for Driver employees in violation of A.R.S. § 23-202;

b.      failure to maintain payroll records for Driver employees in violation of A.R.S. § 23-364; and

c.      failure to remit minimum wage to Driver employees in violation of A.R.S. § 23-363.

69.     As a result of Uber's violations, Plaintiff is entitled to recover damages associated with the wages and benefits withheld in violation of Arizona law as well as attorneys' fees pursuant to A.R.S. § 23-355. In addition, Plaintiff seeks the imposition of penalties on the Defendants with respect to the applicable provisions of A.R.S. § 23-341 and § 23-364.

/ / /

/ / /

/ / /

## COUNT II

### (Tortious Interference with Contract & Business Relations)

70.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

71.     Uber interfered with the continuing business relationship between Drivers and fares—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to Drivers, including Plaintiff, absent Uber's interference.

72.     Uber intentionally and maliciously interfered with Plaintiff and Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

73.     Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

74.     For example, up until the end of 2012, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Beginning in 2013, Uber's website has stated that "there is no need to tip."

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

75.     Even after the statements were apparently removed from the Uber's website at the end of 2012 that tips are included in the fare, Uber has nevertheless continued to inform passengers through marketing materials that tips are included in the fare. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

76.     In addition, at various times (and at least through the end of 2012), Uber's contracts with its customers have incorporated by reference the statements and representations made on its website regarding pricing, which includes such statements as the "tip is included" in the fare. For

example, Uber's contracts with its customers (at least through the end of 2012) contained such statements as: "The Company may change the fees for our Service or Software as we deem necessary for our business. We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software."

77.     However, despite Uber's representations to customers that the fare includes a gratuity (and despite Uber's contracts with customers that incorporated its pricing information on its website, including the website statements that "tip is included"), Uber drivers have not received the total proceeds of this gratuity.

78.     In reality, Uber collected gratuities and then failed to remit them to drivers.

79.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

80.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

81.     Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

82.     Uber's conduct damaged Plaintiff and other drivers.

## **COUNT III**

### **(Breach of Contract)**

83.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

84.     Uber has an implied in-fact contract with Plaintiff and other Drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

85.     Plaintiff and other Drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to Drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages.  By entering

into this agreement, customers intended to secure a financial benefit for Drivers, including Plaintiff, in the form of gratuity and to act directly for the Drivers' benefit.

86.     At all times, Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare. Uber has also failed to reimburse Plaintiff for his employment related expenses.

87.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT IV

### (Unjust Enrichment)

88.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

89.     Defendants unlawfully retained gratuities promised to Plaintiff and other drivers and failed to reimburse expenses.

90.     Defendants obtained these benefits from drivers by making material misrepresentations and taking advantage of them.

91.     As a result, Defendants have been unjustly enriched through their retention of a portion of the gratuities owed to the drivers.

92.     Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities.

## COUNT V

### (Conversion)

93.     Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

94.     Plaintiff and other Drivers have a superior right to possession of gratuities.

95.     Uber interfered with Plaintiff's right to his personal property by refusing to relinquish the property to them.  Instead, Uber retained the property for its own benefit without Plaintiff's permission.

96.     The converted property was personal.  For examples, the gratuities were specifically earmarked for the Drivers.

97.    Uber's conduct damaged Plaintiff's and they are entitled to restitution for their full share of proceeds, as well as treble damages.

**COUNT VI**

**(Fraud and/or Intentional or Negligent Misrepresentation)**

98.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

99.    Uber represented to Plaintiff and other Drivers that they would receive gratuities, surge fares, and cancellation fees.  Uber did not pay these monies as promised.

100.    These misrepresentations were material because they affected Plaintiff and other Drivers' decisions to continue driving for Uber.

101.    Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other Drivers based on its past practices of not doing so.

102.    Plaintiff and other Drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was his employer and the party responsible for overseeing the payment of these monies.

103.    Uber's conduct damaged Plaintiff and other Drivers.

**COUNT VII**

**(Promissory Estoppel)**

104.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

105.    Uber promised to make certain payments, such as hourly wages, cancellation fees, and other payments, and to remit all gratuities to Plaintiff and other drivers. Instead, Uber kept this money for itself.

106.    Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

107.    Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

108.    Plaintiff's and other Drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

109.    Uber's conduct damaged Plaintiff and other drivers.

110.    Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

## COUNT VIII

### (Violations of Fair Labor Standards Act)

111.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

112.    Plaintiff alleges that Defendants have required, or required Plaintiff and Uber Drivers who have driven for Uber, as part of their employment, to work without receiving the minimum wage for all hours worked, under 29 U.S.C. § 206(a), providing in pertinent part: "Every employer shall pay to each of his employees who in any work week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [minimum wage]."

113.    Plaintiff alleges that Defendants have required, or require Plaintiff and Uber Drivers, as part of their employment, to work without additional compensation, such as overtime pay, in excess of the forty hours per week maximum under 29 U.S.C. § 207(a)(1), which provides: "Except as otherwise provided in this section, no employer shall employ any of his employees for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate which is not less than one and one-half times the regular rate at which he is employed."

114.    Plaintiff further alleges, in accordance with 29 U.S.C. § 216, that Defendants have required and/or require Plaintiff and Uber Drivers, as part of their employment, to work without compensation for *all* hours worked, to work beyond forty hours per week without the payment of overtime compensation for such hours, and/or cause them to work at a wage less than the minimum wage, pursuant to, *inter alia*, 29 U.S.C. §§ 206 and 207(a)(1).

115.     Plaintiff's FLSA claims are brought not only for alleged overtime violations, but also for alleged off-the-clock and minimum wage violations as well. Indeed, in the performance of their duties for Defendants, Plaintiff typically worked more than forty hours per week, yet did not receive straight or overtime compensation for the work, labor and services they provided to Defendants, as required by the FLSA. The precise number of unpaid overtime hours will be proven at trial.

116.     Defendants' violations of the FLSA were willful and are ongoing. As a result of the foregoing, Plaintiff seeks judgment against Defendants for all unpaid wages, including overtime wages owed pursuant to 29 U.S.C. §§ 206 and 207, together with an award of an additional equal amount as liquidated damages, and costs, interests, and reasonable attorneys' fees, pursuant to, *inter alia*, 29 U.S.C. § 216(b).

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against the Defendants as follows:

a.     An award of damages, including compensatory, punitive, and treble damages, in an amount to be determined at trial;

b.     Notice to the Classes of the action;

c.     An injunction against Defendants prohibiting Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.     Liquidated damages, pursuant to the A.R.S. and FLSA;

e.     Declaratory relief that Plaintiff and members of the class are employees under the relevant law;

f.     Reasonable attorneys' fees and costs of this action;

g.     Pre-judgment and post-judgment interest as provided by law;

h.     An Order requiring that Defendants return to Plaintiff any gratuities and any other funds wrongfully kept by Defendants; and

i.     Such other and further relief that the Court may deem just and proper.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff, on behalf of himself and the proposed class, demands a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED this 18th day of May, 2016.

/s/ *David W. Lunn*
David W. Lunn, #019526
DKL Law, PLLC
14555 N. Scottsdale Road, Suite 240
Scottsdale, Arizona 85254
T: (480) 500-1360
            -and-
Marie Napoli (*pro hac vice pending*)
NAPOLI LAW PLLC
1301 Avenue of the Americas
10th Floor
New York, NY 10019
T: (212) 397-1000
            -and-
Brittany Weiner (*pro hac vice pending*)
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
T: (212) 736-0007
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2016, I electronically filed the foregoing document with the Clerk of the Court and electronically served a copy of the same upon all parties to this action by using the CM/ECF system.

/s/ *Patricia Klank*